UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CHARLES MILLER : | |
|     Plaintiff, : | |
| v. : | |
| : | |
| NATIONAL LIFE INSURANCE CO. : | 07cv00364(PCD) |
|     Defendant. : | |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Charles Miller, brings this action alleging willful discrimination on the basis of age in violation of CONN. GEN. STAT. § 46a-60(a)(1). Plaintiff also brings claims under CONN. GEN. STAT. § 46a-60(a)(4) for retaliation. [Compl. Doc. No. 1] Defendant National Life Insurance Company moves pursuant to Fed. R. Civ. P. 56(c) for summary judgment as to all claims. For the reasons stated herein, Defendant's Motion for Summary Judgment [Doc. No. 101] is **denied.**

**I.   Background**

Plaintiff Charles Miller is a citizen of Connecticut. (Compl. ¶ 1.) Defendant National Life Insurance Company ("National Life") is a Vermont Corporation that conducts business in the State of Connecticut. (Id. ¶ 2.) Sentinel Financial Services ("Sentinel") is a subsidiary of National Life; it manages investment portfolios and sells institutional and mutual fund accounts. Sentinel is closely controlled by National Life. (Id. ¶¶ 3-7.)

Plaintiff Miller was employed by Sentinel as a wholesaler of financial products from April 1997 through November 29, 2005. He received his compensation and benefits through National

Life. (Id. ¶¶ 8, 9.) Sentinel divided the country into different sales territories, each covered by a wholesaler. Miller's territory originally consisted of parts of New York, parts of Connecticut and all of New Jersey. (Id. ¶ 11.) Miller and the other wholesalers received a compensation package consisting of a base salary plus commission on sales. Miller submits that during this time period he was "one of the top wholesalers." (Scrimgeour Aff. ¶ 9.)

In February 2005, Christian Thwaites was hired as President and CEO of Sentinel, becoming one of Miller's supervisors. (Id. ¶ 18.) At the time of Christian Thwaites' arrival, the Plaintiff was fifty-nine years of age. (Id. ¶ 20.) Bruce Johnston was hired soon thereafter as Miller's direct supervisor. At the time, Johnston was fifty-five years of age. (Def.'s Memo. in Support of Summ. Judg. at 1.) Plaintiff alleges that Thwaites' arrival created a new corporate culture, which was hostile to and critical of persons over 40, including Plaintiff. Plaintiff alleges that Thwaites and the company began a series of discriminatory acts "designed to rid the company of wholesalers who were perceived to be too old." (Compl. ¶ 23.)

Plaintiff submits that shortly after becoming CEO, Thwaites made several age-based remarks to other senior company officials, including the outside board of directors. Plaintiff claims that Thwaites stated that he wanted "younger wholesalers" and "wanted to replace the existing wholesalers with twice as many twenty-five year olds." (Grab. Aff ¶ 6; Grab. Depo. at 94-95; Scrimgeour Aff. ¶ 3; Scrimgeour Depo. at 75.) Plaintiff testified that Thwaites regularly screamed at and belittled Plaintiff. (Miller Decl. ¶¶ 28, 30, 47, 75.)

On July 1, 2005, Miller's sales territory was reduced. Part of New Jersey was given to Jonathan Schonberg, who was twenty-eight at the time. (See Schonberg Depo.) At this time, the company also reduced the size of several of its territories, increasing its territories from ten to

sixteen. Defendant submits that this increase in number and reduction in size had been discussed even before Thwaites' arrival, and that Steven Scrimgeour and Chip Catalogne presented Thwaites with models for the territory changes. (Johnston Decl. ¶¶ 27-29.) Upon Thwaites' arrival, Sentinel also changed its wholesalers' compensation, reducing commissions. Defendant explains that this change was part of a new effort and business plan to increase competitiveness with comparable companies. (Johnston Decl. ¶¶ 14-16.) However, since 2005, Sentinel's revenue has declined. (Ex. K; Ex. T.)

Plaintiff argues that Defendant made his job performance more difficult by assigning his "valued" internal salesman, Greg Pierce, to another wholesaler (Jay Ivison) and forcing him to share support staff. Pierce, however, testified that he requested a transfer to work with Ivison. (Pierce Decl. ¶¶ 12-13.)

In the summer of 2005, Thwaites and Johnston implemented performance standards for Sentinel's wholesalers. Wholesalers were now required to hold a certain number of meetings per week. According to charts prepared by Defendant, Plaintiff's performance, measured in number of meetings, did not meet the goals set by the company for the summer of 2005. (Johnston Decl. ¶¶ 40-43; Johnston Decl. Ex. 14.) On October 7, 2005, Sentinel issued Performance Improvement Plans ("PIPs") to six "underperforming" wholesalers, warning them of discipline if they did not increase their number of meetings.[1] (Id. ¶49; Id. Ex. 19.) Defendant argues that Plaintiff showed no improvement in October and held less than half the meetings his PIP required. (Id. Ex. 25.)

---

[1] Only two wholesalers met the performance standards. (See Decker Decl. ¶ 7.)

Defendant submits that due to this performance, Plaintiff was terminated on November 29, 2005. (Id. ¶¶ 53-68; Decker Decl. ¶ 23.)

Plaintiff counters however, that he was not terminated based on performance, but because of age discrimination and retaliatory animus. He argues that during the entire period of his employment he was a top salesman for the company, winning awards and receiving special bonuses. (Scrimgeour Aff. ¶ 9; Miller Decl. ¶ 20.) He also posits that Sentinel's calculation of his performance was incorrect. He claims that it did not account for his vacation days and that the method of calculating visits misrepresented the number of meetings he held, especially the number of representatives he saw. He further maintains that he was not credited for certain meetings. (Miller Decl. 11, 84, 96, 124; See also Johnston Decl. Ex. 17, Ex. 18; Pine Aff. ¶ 7.)

Plaintiff repeatedly complained to human resources, Johnston, Thwaites and Thomas Macleay about a hostile environment, changes at the company and age discrimination. In June 2005, Plaintiff spoke to William Decker, head of human resources about these issues. (Pl.'s Memo. in Opp. to Summ. Judg. at 27.) On July 25, 2005, Plaintiff's attorney wrote to Sentinel invoking Plaintiff's "human rights." (Ex. W.) Plaintiff also wrote letters of complaint regarding age discrimination and other employment issues on October 19 (Ex. C), November 8 (Ex. EE), and November 19, 2005. (Ex. HH.)[2]

Defendant further argues that although there were significant personnel changes in 2005,

---

[2] William Decker, head of human resources, held meetings and conference calls with Miller regarding his complaints during the summer of 2005. He asserts, however, that he was only aware that Miller's complaints involved age discrimination after the October 19 letter. (Decker Decl. ¶¶ 4, 8.)

the average age of its wholesalers increased from 45 to 47.8 between February 1, 2005 and January 30, 2006. (Def.'s Memo. in Supp. of Summ. Judg. at 2.)

Plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") on April 1, 2006. The CHRO issued a release of jurisdiction on January 4, 2007. (Compl. ¶ 59.) Plaintiff now works at least part time for Water Island Capital. (Miller Depo at 469.)

## II.     Standard of Review

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A material fact is one which "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, "[c]onclusory allegations will not suffice to create a genuine issue." Delaware & H.R. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990). The moving party bears the burden of establishing that summary judgment is appropriate. Anderson, 477 U.S. at 225. "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on the plaintiff's part, and, at that point,

plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).

In determining whether a genuine issue has been raised, all ambiguities are resolved and all reasonable inferences are drawn against the moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980). Determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment as such are within the sole province of the jury. Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996). "If reasonable minds could differ as to the import of the evidence . . . and if . . . there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal citations omitted); see also Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000) ("when reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.").

"[The Second Circuit has] repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) (citing Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)). Where an employer has acted with discriminatory intent, direct evidence of that intent will

only rarely be available, so that "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." Gallo, 22 F.3d at 1224.

### III.     Discussion

#### A.  Standard for Analysis

Plaintiff argues that the Court should analyze his claim under the framework established in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) (superceded by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (1991) (modifying aspects of the standard and the remedial effects of satisfying relative burdens but not altering the burden-shifting framework itself)).  The Price-Waterhouse analysis is used only when a plaintiff has shown "direct evidence that [the employer] has placed substantial reliance on factors whose consideration is forbidden [by the ADEA]." Price-Waterhouse, 490 U.S. at 271.

In Price-Waterhouse, the plaintiff was told that she did make partner because she was not feminine enough. Id. at 235.  Plaintiff argues that Christian Thwaites' comments expressing a preference for younger wholesalers qualifies as direct evidence of discrimination.  However, Thwaites' alleged comments are not analogous to Price-Waterhouse.  Although they may be some evidence of discrimination, they were not made specifically in reference to the employment actions in Plaintiff's complaint and therefore are not "direct" evidence of the kind required to change the framework from the usual McDonnell Douglas standard.  Price-Waterhouse is used for mixed-motive cases, where the plaintiff has shown that an impermissible reason was at least one of the motivating factors for the employer's decision. Ostrowski v. Atlantic Mutual Ins., 968 F.2d 171, 182 (2d Cir. 1992) (finding that a jury instruction on Price-Waterhouse is appropriate where

7

plaintiff sufficiently proved that the forbidden factor played a "motivating role.") Here, however, Plaintiff has not proven that the Defendant's decisions were based on age. The comments, as well as their significance, is precisely the dispute in this motion. Therefore, the McDonnell-Douglas burden shifting analysis applies.

### B. Count I: Conn. Gen. Stat. § 46a-60(a)(1)

Conn. Gen. Stat. § 46a-60(a)(1) provides that it shall be a discriminatory practice for an employer to: "refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disability, mental retardation, learning disability or physical disability, including, but not limited to, blindness." Connecticut anti discrimination law ("CFEPA") mirrors the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.*, ("ADEA") and allegations of age discrimination brought pursuant to the former are analyzed according to the federal standards. Hayes v. Compass Group USA, Inc., 343 F.Supp.2d 112, 118 n.2 (D. Conn. 2004). ADEA claims, like those brought pursuant to Title VII, are analyzed under the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1972). See Schnabel v. Abramson, 232 F.3d 83 (2d Cir. 2000).

#### 1. Statute of Limitations

"Any complaint filed pursuant to this section must be filed within one hundred and eighty days after the alleged act of discrimination." Conn. Gen. Stat. § 46a-82(f). Plaintiff filed his complaint with the CHRO on April 26, 2006. (Compl. ¶ 59.) Therefore, Plaintiff's complaint of

wrongful termination on November 29, 2005 (Compl. ¶ 63) is timely. Furthermore, the charge filing requirement does not bar an employee from using acts prior to the 180 days as background evidence in support of a timely discrimination claim. National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 102 (2002). Therefore, Plaintiff's arguments concerning territory and compensation changes are properly before this Court as background evidence in support of the crux of his claim, unlawful termination.

### 2. Disparate Treatment

Plaintiff's claim alleging disparate treatment on the basis of race and color is analyzed under the three-step burden shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981); St. Mary's Honor Center v. Hicks, 509 U.S. 502, 519, 524 (1993). A plaintiff has the initial burden of establishing a *prima facie* case of discrimination by showing that (1) at the relevant time the plaintiff was a member of the protected class; (2) the plaintiff was performing his duties satisfactorily; (3) the plaintiff suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination on the basis of his membership in that class. McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997); Austin v. Ford Models, Inc., 149 F.3d 148, 152 (2d Cir. 1998). A plaintiff's burden in establishing a *prima facie* case of employment discrimination is not an onerous one; he merely has to present facts sufficient to give rise to a presumption of discrimination. See Burdine, 450 U.S. at 254; Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001) ("a plaintiff's burden of establishing a *prima facie* case is *de minimis*.").

A plaintiff's establishment of a *prima facie* case gives rise to a presumption of unlawful

discrimination, and the burden of production shifts to the defendant. Id. If the defendant then proffers a "legitimate, nondiscriminatory reason" for the challenged employment action, Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001), "the presumption of discrimination drops out," Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001), and the plaintiff must prove that the legitimate reasons offered by the defendant were "not its true reasons but were a pretext for discrimination." Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000)). A plaintiff's legitimate questions regarding the reasonableness and credibility of the proffered justification are probative on the question of pretext. Meiri v. Dacon, 759 F.2d 989, 997 n.13 (2d Cir. 1985). At all times, the ultimate burden of persuasion remains with the plaintiff to show that the defendant intentionally discriminated against him. Hicks, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 256).

Plaintiff is a member of a class protected from discrimination based on age, as he was 59 in 2005. (Compl. ¶ 61.) Plaintiff was qualified for his position, and was considered by some as among the company's top wholesalers. (Scrimgeour Aff. ¶ 9.) It is not disputed that he suffered an adverse employment action when he was terminated. Furthermore, Thwaites' alleged comments expressing a preference for younger employees give rise to an inference of discrimination. (Grab Aff. ¶ 8, 10; Scrimgeour Aff. ¶ 3.)

The burden then shifts to Defendant to state a legitimate, nondiscriminatory reason for the challenged employment actions. Defendant proffers that each of its actions were taken for legitimate, non-discriminatory reasons as part of a new business plan. To begin, Plaintiff's compensation structure was changed in May 2005, along with the compensation of all Sentinel's wholesalers. Defendant claims that the compensation model was changed in order to be more

consistent with comparable companies (Johnston Decl. ¶¶ 14-16) and that specific wholesalers were not targeted by the change.  Plaintiff also argues that Defendant made his job  more difficult by reassigning Greg Pierce, forcing Plaintiff to share support staff.  Defendant counters the reassignment was at Pierce's request. (Id. At 14.)

Miller complains that his sales territory was reconfigured and reduced in size, with part of his territory given to a younger wholesaler.  Defendant counters that Plaintiff's territory was not reduced because of his animus, but as part of a larger reconfiguration of Sentinel's territory and sales strategy.  Defendant argues that increasing the number of Sentinel's territories (and therefore decreasing the size of certain territories) had been recommended by Sentinel managers Steven Scrimgeour and Chip Catalogne before Thwaites was hired. (Johnston Decl. ¶ 28; Johnston Decl. Ex. 11; Scrimgeour Depo. at 83.)  Furthermore, although part of Plaintiff's territory was given to a younger wholesaler, wholesalers younger than Plaintiff also had their territories reduced.  (Def.'s Memo. in Support of Summ. Judg. at 11.)

Defendant argues that the implementation of performance standards and Plaintiff's negative performance reviews were not discriminatory because Johnston, not Thwaites, established the standards and measured Plaintiff's conduct. (Id. at 12.)  Defendant claims that the sales requirements were uniform for all wholesalers and that other wholesalers, both younger and older than Miller, were warned about their performance and issued performance improvement plans ("PIPs").  (See Wholesalers' PIPs, Johnston Decl. Exs. 19-23.)  Defendant offers the non-discriminatory explanation for Plaintiff's termination that Plaintiff failed to better his performance and did not meet his PIP.  Johnston testified that Plaintiff did not improve after receiving his October 7, 2005 PIP and held only half the meetings required.  (Johnston Decl. ¶¶ 53, 67.)  He

testified that the decision to terminate Plaintiff was based on Miller's performance in the fall of 2005. (Id. ¶ 68.)  Defendant also argues that the average age of their employees increased (by more than 1 year) from February 1, 2005 to January 1, 2006.  (Def.'s Memo. in Support of Sum. Judg. at 15-16.)

Given that Defendants have articulated reasonable and non-discriminatory explanations for the alleged adverse employment actions, the burden shifts back to Plaintiff to offer evidence that Defendant's reasons are merely pretext for discrimination on the basis of age.  Ultimately, the Defendant's non-discriminatory explanations are called into question by testimony showing that Christian Thwaites, the President and ultimate decision maker of Sentinel, may have been motivated by bias against Plaintiff's class.

Plaintiff argues that Defendant purposefully miscounted his meetings and misjudged his performance in order to have a pretext under which to fire him.  Defendant has many exhibits tending show that Miller's performance was problematic. (Charts of Meetings Held Summer 2005, Johnston Decl. Exs. 14-18.)  However, Miller complained to Johnston and Thwaites that his performance was not being calculated correctly. (Ex. T at 372; Miller Decl. ¶ 11).  Plaintiff claims that because he held meetings many representatives at once (and then met with them individually), he was not credited for all his meetings and that his vacation time was not taken into account.[3] (Miller Decl. ¶ 84-85.)  Furthermore, Plaintiff presents evidence of good performance, including his special bonuses for 29 quarters (Miller Decl. ¶ 20) and his sales desk manager's testimony that Miller was among the top wholesalers. (Scrimgeour Aff. ¶9.)

---

[3]Plaintiff's argument is given some credence by the disparity between Miller's performance if calculated according representatives visited versus number of meetings held. (Compare Johnston Decl. Ex. 17, Johnston Decl. Ex. 18.)

While Miller's allegations alone are not enough to prove pretext, Plaintiff also presents testimony that Thwaites made discriminatory comments. Sentinel's Chief Financial Officer testified that Thwaites asked him his age (Grab Aff. ¶ 7), told the board of directors and senior officers that "we need younger wholesalers," (Id. ¶ 8) and commented on hiring a "young and energetic" new salesman. (Id. ¶ 10.) Scrimgeour also testified that Thwaites told him that we "could replace our wholesalers with twice as many 25 year olds and have them do the job." (Scrimgeour Aff. ¶ 3.)

The Second Circuit has held that "[c]omments showing discriminatory animus made by the decision-maker or by someone whose input played a material role in the employment decision may raise an inference of pretext." Shah v. James P. Purcell Assoc., Inc., 2007 WL 1630311 at *5 (D. Conn. 2007). In determining whether Thwaites' statements are probative of a discriminatory motive, the Court must consider several factors - namely, the speaker of the alleged remarks, the content, and the context in which said remarks were made. D'Agostino v. Hous. Auth. of Waterbury, 2006 WL 3388403 at *7 (D. Conn. 2006). Thwaites, the President and CEO, made discriminatory remarks at a board meeting, as if to suggest a new business plan. The remarks were also made shortly before the alleged adverse employment actions. Defendant argues that Johnston, not Thwaites, was responsible for Plaintiff's performance review and termination; however, this argument is unconvincing. Thwaites certainly had a supervisory role over Plaintiff. Thwiates was Johnston's boss and President of the company. A reasonable jury could infer that Johnston implemented policies based on his boss' publicly expressed discriminatory animus.

Defendant argues that Thwaties' comments are mere "stray" remarks and "stray remarks alone do not support a discrimination suit." Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir.

13

1998). However, remarks made by a new CEO to the board of directors that could be construed as his plans for hiring are not stray. As the CEO, Thwaites was likely to have significant influence over the company's new business plan and personnel policies. Such influence undermines National Life's argument that Thwaites' comments were "stray." Rose v. New York City Bd. of Educ., 257 F.3d 156 (2d Cir. 2001) (noting that remarks made by a supervisor with significant influence over the decision making process are less likely to be stray than remarks made by a colleague); Ostrowski v. Atlantic Mut. Ins. Co., 968 F.2d 171, 182 (2d Cir. 1992) (describing stray remarks as those made by people "not involved in the pertinent decision-making process"); see also Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111 (2d Cir. 2007) (collecting cases that have deemed remarks made by persons in supervisory roles as not "stray"). Thwaites' statements, especially when considered in the light most favorable to Plaintiff, create a genuine issue of material fact regarding Defendant's motives.

Although Defendant disputes the testimony concerning Thwaites' comments and both sides question the credibility of the other's witnesses, credibility is a question for the jury. "[S]ummary judgment under Rule 56 ... may not be invoked where, as here, the [depositions of the principal witnesses] present conflicting versions of the facts which require credibility determinations." Davis v. Zahradnick, 600 F.2d 458, 460 (4th Cir. 1979) (per curium); See also Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir.1986). The evidence presented by each side creates a question of material fact as to whether Defendant's explanations are pretext for discrimination. On this count, summary judgment is **denied.**

### C. Count Two: Conn. Gen. Stat. § 46a-60(a)(4)

Conn. Gen. Stat. § 46a-60(a)(4) states that: "it shall be a discriminatory practice in

violation of this section to discharge, expel or otherwise discriminate against any person because such person has opposed any discriminatory employment practice or because such person has filed a complaint or testified or assisted in any proceeding under section 46a-82, 46a-83 or 46a-84." Again, claims under this section are analyzed according to the federal standards prohibiting retaliation.  To establish a *prima facie* case of retaliation a plaintiff must show: "(1) that he was engaged in protected activity by opposing a practice made unlawful; (2) that the employer was aware of that activity; (3) that he suffered an adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action."  Holtz v. Rockefeller & Co., 258 F.3d 62, 79 (2d Cir. 2001) (quoting Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998)).

Defendant does not dispute that Plaintiff was engaged in protected activity.  Plaintiff's October 19, 2005 (Decker Decl. Ex. 2), November 8, 2005 (Exhibit EE) and November 19, 2005 (Exhibit HH) letters to his superiors and human resources complaining of age discrimination are protected activity.  Defendant does not dispute that it was aware of this activity.  Plaintiff's November 29, 2005 termination is an adverse employment action.  Defendant disputes only the forth prong of the test, arguing that there is no causal connection between the adverse employment action and Plaintiff's protected activity.

Causation can be demonstrated "indirectly by showing that the protected activity was followed closely by discriminatory treatment, through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant."  De Cintio v. Westchester County Medical Center, 821 F.2d 111, 115 (2d Cir. 1987) (internal citations omitted).

Here, Plaintiff must rely primarily on the timing of the adverse employment actions in relation to his complaints of discrimination. Temporal proximity of the adverse action to the protected activity is a key indicator of retaliation. See Mody v. GE, 2006 U.S. Dist. LEXIS 8611 at *31-32 (D. Conn. 2006); Clark City School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001). Although temporal proximity is relevant, where gradual adverse job actions began well before the plaintiff engaged in protected activity, the inference of retaliation does not arise. Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87 (2d Cir. 2001). Defendant claims that discipline began no later than September 13, 2005, when Johnston issued a group warning to all wholesalers. (Def.'s Mem. in Opp. to Summ. Judg. at 19.) Plaintiff then received his first individual warning on October 7, 2005 in the form of his PIP. There is a factual dispute regarding when Plaintiff first engaged in protected activity. Defendant argues that Plaintiff's October 19, 2005 letter was his first protected activity because it specifically complained of age based bias. Plaintiff counters that the July 25, 2005 (Ex. W) letter from his counsel seeking discussions was his first protected activity, as Defendant was thereafter aware of his allegations of discrimination. However, even taking the dates most favorable to Defendant, this is not a case where a progressive course of discipline began *well* before Plaintiff's complaints. The gradual adverse employment actions in Slattery began five months, not one month, before plaintiff first complained. This temporal proximity, combined with the factual dispute as to whether Plaintiff's protected activity began before the course of discipline is enough to create a nexus for the *prima facie* case.

Defendant then proffers the non-discriminatory explanation that Miller did not improve his performance following the warnings that were issued. (Def.'s Mem. in Support of Summ. Judg. at 19; Johnston Decl. ¶¶ 49, 67-68.) Miller's PIP, as well as the October 25, 2005 letter from

16

Johnston (Johnston Decl. Ex. 19, Ex. 25) did in fact warn Plaintiff that he would be subject to discipline if his performance did not improve. Defendant asserts that several wholesalers of varying ages received warnings and discipline but Miller was fired because the others improved their performance.

     Given that Defendant has articulated a reasonable and non-discriminatory explanation for the adverse employment action, the burden shifts back to Plaintiff to offer evidence that the Defendant's reasons are merely pretext for retaliation. As discussed above, Plaintiff argues that Defendant miscounted his meetings and misstated his performance in order to create a pretext. As also discussed above, Defendant has many exhibits tending show that Miller's performance was problematic. (Charts of Meetings Held Summer 2005, Johnston Decl. Exs. 14-18.) However, Plaintiff is also able to offer some evidence of good performance, as well as plausible reasons (vacation time and the high number of representatives he met with during each meeting) why his performance was undervalued by Defendant's charts. Therefore, Plaintiff's performance cannot be evaluated without deciding the credibility of the witnesses of both parties, an issue within the sole province of the jury. Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996). Furthermore, Plaintiff shows that his complaints aroused anger from Christian Thwaites. Thwaites wrote Miller, telling him that he had a "febrile imagination" and his complaints were "mostly illiterate." (Ex. V.)

     In addition, Plaintiff was terminated just ten days after he wrote the head of human resources emphasizing his rights under the law, his belief that he was being discriminated against based on his age and arguing that complaints about his performance were pre-textual. (Ex. EE.)

This extremely close temporal relationship,[4] Defendant's demonstrated anger and the credibility issues raised by both parties create a question of material fact as to whether Plaintiff's termination was the result of retaliatory animus.  Summary Judgement is **denied** as to this count.

### D. Damages

It is unnecessary to fully address either party's claims regarding damages in this motion except to note that there is a disputed question of material fact as to whether Plaintiff met his obligations to mitigate his damages.  Defendant claims that Miller did not meet this burden. (Def.'s Mem. in Support of Summ. Judg. at 27.)  Plaintiff rebuts by testifying to contacts with search firms and efforts to find work through trade publications. (Miller Depo. at 469-509.)

Furthermore, although this court has found punitive damages available under the CFEPA, Plaintiffs cannot recover both punitive damages and attorneys' fees.  Chopra v. GE, 527 F. Supp. 2d 230, 246 (D. Conn. 2007) ("under CFEPA, punitive damages are considered to be limited to fees and costs").

---

[4] Courts have found that the even the longer time periods of one to two months between protected activity and adverse employment action can establish causation for the *prima facie* case.  Treglia v. Town of Manilus, 393 F.3d 713, 720 (2d Cir. 2002) (finding a time period of a few months sufficient to establish causation); Jones v. Yonkers Pub. Schs., 326 F. Supp. 2d 536, 548 (S.D.N.Y. 2004) (finding a time period of one month established a causal nexus).  Therefore, a reasonable jury could find that a termination just ten days after a strong complaint creates an inference that Plaintiff's termination was retaliation.

## IV.     CONCLUSION

Defendant's motion for summary judgment [Doc. No. 101] is **denied.**

SO ORDERED.

Dated at New Haven, February  10 , 2009.

/s/
Peter C. Dorsey, U.S.D.J.